**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| RANDALL TRAVIS GREEN, )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)<br>MIKE ADDISON, Warden, )<br>)<br>Respondent. ) | Case No. 09-CV-480-TCK-TLW |

## OPINION AND ORDER

This is a 28 U.S.C. § 2254 habeas corpus action. In an Opinion and Order filed December 21, 2011 (Dkt. # 15), the Court denied the petition for writ of habeas corpus. Petitioner appealed. By Order and Judgment filed October 19, 2012 (Dkt. # 33), the Tenth Circuit Court of Appeals vacated only that portion of this Court's Opinion and Order denying habeas corpus relief on Petitioner's claim that his convictions rested upon perjured testimony knowingly offered by the government, see Dkt. # 15, and remanded that issue for an evidentiary hearing. On April 15, 2013, the Court held the evidentiary hearing. See Dkt. # 61. The parties filed post-hearing briefs. See Dkt. ## 65, 66. For the reasons discussed below, the Court finds Petitioner's request for habeas corpus relief on the remanded issue shall be denied.

### *BACKGROUND*

In the Order and Judgment remanding for an evidentiary hearing, the Tenth Circuit provided the following background summary:

> In 2006, Green was convicted by a jury in Rogers County, Oklahoma, on ten felony offenses: three counts of first-degree rape, two counts of forcible sodomy, one count each of first-degree burglary, extortion, and kidnapping, and two counts of the lesser-included offense of second-degree rape. He was sentenced to a total of seventy-three years in prison with the sentences to run consecutively.

Green was charged with sexually assaulting four victims: 26-year-old Korie Bethel, 13-year-old L.S., 13-year-old J.C., and B.O., who turned 15 years old between the first and second incidents of assault. Green was 23 years old at the time of the second offense against B.O., and 22 years old at the time of the other incidents.

Green argues that L.S. and J.C.'s testimony at trial was false and coerced by the prosecution. L.S. and J.C. each testified that on October 1, 2005, they were babysitting at Christina Crawford's house for Crawford's two children. At around 11:00 p.m., Green arrived at the house with a friend, Jeffrey Peppers, and asked for Crawford. After learning that Crawford was not home, Green asked to speak with L.S., who was his former neighbor. According to L.S. and J.C.'s testimonies, Green took L.S. into a bedroom while J.C. and Peppers were outside of the house. In the bedroom, Green pulled down L.S.'s pants and raped her. Afterward, L.S., J.C., Green, and Peppers talked in the living room. A few minutes later, Green asked J.C. to go into the garage with him. Green asked J.C. to perform oral sex on him and asked her to have sex with him. J.C. refused. Green then forced J.C. to perform oral sex on him, and forced her to have sexual intercourse with him. The two then returned to the living room. Ten minutes later, Green and Peppers left the house.

At trial, Bethel testified that in the early morning of August 30, 2005, she and Green were talking with mutual friends outside of her apartment. Bethel returned to her apartment after the group had dispersed. As Bethel was opening the door to her apartment, Green forced himself inside and raped and sodomized her for several hours. Bethel claims that after the attack, Green forced her to sign a note stating the encounter was consensual.

B.O. testified that Green forced her to have sex with him several times between November 2005 and January 2006. This occurred at Green's sister's house. B.O. claimed that the sex was non-consensual but admitted that she had returned to that house several times, leading to more sexual encounters with Green.

The jury convicted Green of all charges related to J.C., L.S., and Bethel. The jury convicted Green of second-degree rape of B.O., acquitting him on the first-degree rape charge.

Green directly appealed his judgment and sentence to the Oklahoma Court of Criminal Appeals (OCCA), raising three points of error: the prosecution's failure to corroborate the victims' statements, prejudice from joinder of multiple claims, and ineffective assistance of trial counsel. The OCCA affirmed the state district court's judgment and sentence.

Green then filed a pro se application for post-conviction relief in the state district court, arguing that he was deprived of due process in violation of his

Fourteenth Amendment rights and that he received ineffective assistance of trial and appellate counsel in violation of his Sixth Amendment rights. In his post-conviction motion, Green alleged that he was denied due process by the prosecution's knowing use at trial of false and coerced testimony from J.C. and L.S. In support of his motion, Green submitted the transcript of a conversation between J.C., J.C.'s mother, and David Starkey, who was conducting an independent investigation of official misconduct in Rogers County. The conversation took place on January 27, 2008. It was recorded by Starkey and later transcribed by a court reporter. The transcript includes a signed and notarized verification page, where J.C. and her mother signed a statement indicating that they had reviewed all the contents of the transcript and confirmed the contents to be "true and correct." They also initialed each page of the transcript. In his post-conviction application, Green also requested an evidentiary hearing "so that a record can be made to reflect what actually transpired."

During the interview with Starkey, J.C. revealed that Green did not rape her. According to J.C., "On my statement, it said specifically I was not raped, I – I did that willingly, and then . . . the next thing I know, I'm reading a paper that says, you know, this is . . . first-degree rape." J.C. explained that she was coerced into falsely accusing Green of rape. In her interview, J.C. said that Wayne Stinnett, an investigator for the Rogers County District Attorney's Office, and Patrick Abitbol, an assistant district attorney, told her, "'You have to say in the camera that he raped you; otherwise, it's not going to work and then you can get thrown in juvie, and which you will.'"

J.C. also stated in the interview that she believed L.S. had not been raped by Green, whom she refers to as Travis:

> [J.C.]: That was all [L.S.], and it's just because Travis would not go out with her. That's the thing, Travis won't go out with her. They just wanted to be little buddies – he wanted to be little buddies, and that's – that's all there is to it. She lied. I'm – I'm highly doubting she even had sex with him. I mean, yeah, she was, like, all over him and stuff.
>
>  . . .
>
> [J.C.]: If – no – yeah, if our stories weren't the same, then I was going to go to juvie. I don't know what they said to [L.S.] because, you know, we were – we're not allowed to speak of anything what they tell us, and that's what they told us.
>
> So me and [L.S.], we're sitting there and we're like, "What'd they say to you?"

3

> "I can't tell you. I'll go to juvie," you know.
>
> DAVID STARKEY: So she was threatened with juvie too.
>
> [J.C.]: I guess so.
>
> . . .
>
> She was like, "I just don't want to go to juvie," and, you know, that – that kind of makes me wonder, Well, did they threaten you too? Because she told me that straight up at court. She's like, "I don't want to go to juvie."

The state district court denied Green's application for post-conviction relief without holding an evidentiary hearing. Despite evidence of J.C.'s interview transcript, the state court found that "the facts relayed by J.C. are consistent throughout and are not the creation of the State." The state district court reasoned that "J.C. has not testified in this proceeding that her testimony at trial was false," and that "[t]he statements made by J.C. outside the confines of these proceedings do not in and of themselves suggest that J.C.'s statements at trial were false." The state district court also "[did] not find the out of court statements probably true, nor that said statements would result in an acquittal." The OCCA affirmed the state district court's denial of Green's application for post-conviction relief, noting that "[t]he transcript of the conversation between victim J.C., her mother and David Starkey is simply that, a conversation." The OCCA described the transcript as "convoluted" and "disjointed." The OCCA also said that "[i]t contains no recantation of the victim's original claims, nor does it constitute proof of Petitioner's innocence."

Green attempted to obtain post-conviction relief from the state district court a second time on separate grounds. The state district court denied his second petition for post-conviction relief, and the OCCA affirmed the denial on appeal.

On July 22, 2009, Green filed a petition for habeas corpus under 28 U.S.C. § 2254 in federal district court. He identified seven grounds for relief: (1) the allegations were not corroborated as required by law; (2) the three separate groups of offenses should have been tried separately so as to avoid prejudice; (3) Green was denied effective assistance of trial counsel when counsel failed to object to joinder; (4) Green's convictions rest upon perjured testimony that the government knowingly offered; (5) an expert witness improperly vouched for the truthfulness and credibility of the alleged victims; (6) the state failed to disclose exculpatory impeachment evidence regarding a victim's prior rape allegation; and (7) Green was denied effective assistance of appellate counsel when counsel failed to assert certain claims of error on direct appeal. Green also requested an evidentiary hearing in his federal

>petition for habeas corpus. The federal district court dismissed Green's petition in full and denied COA in the same order.

See Dkt. # 32 at 2-7 (footnote omitted) (citations to record omitted).

*EVIDENTIARY HEARING*

On April 15, 2013, the Court conducted the evidentiary hearing as directed by the Tenth Circuit. See Dkt. # 62. Petitioner was present and represented by attorney Paul DeMuro. Id. at 4. Respondent was represented by Assistant Attorneys General Donald D. Self and Jay Schniederjan. Id. Petitioner testified on his own behalf. Id. at 10-43. He also presented the testimony of J.C., id. at 45-116; and Andrea Curry, J.C.'s mother, id. at 116-144. After Petitioner rested, Respondent presented three (3) witnesses: Wayne Houston Stinnett, a detective with the Claremore Police Department who investigated the rape allegations made against Petitioner, id. at 144-179; Patrick Abitbol, the Rogers County Assistant District Attorney who prosecuted the criminal case against Petitioner, id. at 180-202; and Jennifer Lynn Sanbrano-Hester, a former Rogers County Assistant District Attorney who assisted Mr. Abitbol with prosecution of the case against Petitioner, id. at 202-207. The testimony presented at the evidentiary hearing is summarized below.

**A. Witnesses for Petitioner**

**1. Randall Travis Green**

At the evidentiary hearing, Petitioner Randall Travis Green admitted that, on October 8, 2005, he was at the home of Christina Crawford when L.S. and her friend, J.C., were there babysitting, see Dkt. # 62 at 15-24, but denied having any sexual contact with either J.C. or L.S., id. at 25. He further denied making any sexual advances towards or touching either girl. Id. at 26. He explained that he had gone to Crawford's home to look for his wallet. Id. at 16. Once he found his

wallet, he left, id. at 24, after declining L.S.'s invitation "to stay and hangout and party," and telling L.S. "you know we can't do that – you're too young," id. at 23.

### 2. J.C.

J.C. testified that her trial testimony against Petitioner, that he had forced her to perform oral sex on him and forced her to have sexual intercourse with him, was untrue and that Petitioner did not touch her "in a sexual way" during their encounter in October 2005. See Dkt. # 62 at 52. She further testified that Sgt. Wayne Stinnett, a Claremore Police Officer, came to her home to investigate the rape allegations made by J.C.'s friend, L.S., and told J.C. to tell her mother that she too had been raped by Petitioner. Id. at 60. When she told Stinnett that she had not been raped, he said that she "could be in trouble for a very long time" if she refused to make the rape allegations against Petitioner. Id. A couple of weeks later, her mother took her to the Claremore police station where she again met with Sgt. Stinnett. Id. at 62. She testified that Assistant District Attorney Patrick Abitbol was also present at this meeting. The purpose of this meeting was to prepare J.C. for an interview that was to be conducted and videotaped at the Rogers County Children's Advocacy Center (CAC). J.C. testified that Stinnett and Abitbol gave her the questions that would be asked by the CAC interviewer, id. at 63, and made her watch pornographic videos "so they could teach me all the moves I needed to say," id. at 64. During this meeting, Stinnett and Abitbol threatened to send J.C. to juvenile hall if she did not make rape allegations against Petitioner. Id. When J.C. again told them that she had not had sex with Petitioner, Stinnett and Abitbol "crossed their arms," gave her "mean looks," pointed their fingers in her face and told her "to shut up and listen." Id. at 66.

J.C. further testified that immediately after the meeting with Stinnett and Abitbol, her mother drove her to the CAC for her interview, where she told "the best story" she could. Id. at 69. J.C.

said that her statements made during the taped interview about Petitioner were not true, and that she "did it because they threatened to send me to juvie." Id. at 72. J.C. also testified that Stinnett was in the room during the CAC interview, standing right in front of her but behind the camera, and that he "just crossed his arms and kept looking at me to make sure I was doing a good job." Id. at 102.

J.C. also testified that she met with Stinnett and Abitbol before both the preliminary hearing and the trial in Petitioner's criminal case. Id. at 73-74. During those meetings, Stinnett and Abitbol continued to threaten her. Id. She testified at Petitioner's trial that he had raped her because she was afraid of being "locked up." Id. at 75. When asked by the Court what she knew about juvenile hall, J.C. said "my friends told me about it." Id. at 111.

### 3. Andrea Curry

Andrea Curry is J.C.'s mother. She testified that her daughter never told her about what happened with Petitioner. See Dkt. # 62 at 129. The first time she heard details about J.C.'s rape allegations was during Petitioner's trial. Id. Curry corroborated J.C.'s testimony that, before the CAC interview, J.C. met with Stinnett at the police department. Id. at 134-35. After the meeting at the police station, Curry drove J.C. to the CAC. Id. Curry testified that during the drive, J.C. was "unusually quiet," and said nothing about being threatened or shown pornographic movies. Id. at 136. Curry also testified that about one (1) year after the trial, J.C. began saying that her trial testimony was not true, id. at 129, and that she "most definitely" believed J.C. when she says she was coerced into telling a lie at trial, id. at 130. She also testified that she believed J.C. when she said she had been raped. Id. at 139.

**B. Witnesses for Respondent**

**1. Wayne Houston Stinnett**

Wayne Stinnett testified that his initial contact with J.C. was as a witness to the rape allegations made by L.S. See Dkt. # 62 at 146. He went to J.C.'s home on October 27, 2005, and told her he was there to get a witness statement from her. Id. The next day, he received a phone call from J.C.'s mother. Id. at 147. She told him that J.C. had disclosed that she, too, had been raped by Petitioner. Id. Stinnett testified that the next step he took was to schedule a forensic interview of J.C. at the CAC on November 1, 2005, or only four (4) days after his first contact with J.C. Id. at 148. He testified that he observed the interview via closed-circuit TV, but denied being present in the interview room. Id. at 149. He also denied telling J.C. what to say, id. at 150; stated that it was "absolutely untrue" that he showed J.C. pornography before the CAC interview, id. at 151; and denied threatening to send J.C. to "juvie" unless she falsely accused Petitioner of rape, id.

**2. Patrick Abitbol**

Patrick Abitbol was the Assistant District Attorney who prosecuted the criminal case against Petitioner. He testified that the case was unusual because there were four (4) victims. See Dkt. # 62 at 182. Abitbol also testified that when he received the reports of rape from L.S. and J.C., he had already decided to charge Petitioner with the rapes of the other two (2) victims, Korie Bethel and B.O. Id. at 201. Whenever he spoke with J.C., a "victim/witness representative" was also present. Id. at 183. When asked if he had ever shown J.C. any pornographic material, he responded "[a]bsolutely not." Id. Abitbol also denied telling J.C. how to testify, denied telling her to testify falsely against Petitioner, denied telling her to alter her testimony, also denied threatening to send her to juvenile hall. Id. at 186-88.

### 3. Jennifer Lynn Sanbrano-Hester

The last witness at the evidentiary hearing was Jennifer Sanbrano-Hester. She was an Assistant District Attorney for Rogers County and served as second chair at Petitioner's trial. See Dkt. # 62 at 203. She was present when J.C. was interviewed before the trial. Id. at 204. She testified that Abitbol never told J.C. to lie and that she never told J.C. to lie. Id. at 205-06. In addition, Sanbrano-Hester testified that J.C.'s trial testimony was consistent with her CAC interview. Id. at 205.

## *ANALYSIS*

As stated by the Tenth Circuit in the Order and Judgment remanding Petitioner's claim for an evidentiary hearing,

> The relevant inquiry in whether Green would be entitled to habeas relief is whether (1) "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony"; (2) "the prosecution knew, or should have known, of the perjury"; and (3) "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

See Dkt. # 32 at 16 (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)); see also Giglio v. United States, 405 U.S. 150, 154 (1972) ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" (quoting Napue v. Illinois, 360 U.S. 264, 271 (1959))).

To satisfy the first two prongs of the Agurs standard, the Court must find that J.C. committed perjury when she testified at Petitioner's criminal trial that Petitioner committed forcible sodomy and raped her, and that the prosecution was aware of J.C.'s perjured testimony. To make those findings, the Court is required to find J.C.'s testimony at the evidentiary hearing to be more credible than the testimony of Stinnett and Abitbol. See Schlup v. Delo, 513 U.S. 298, 330-31 (1995)

(applying standard in Murray v. Carrier, 477 U.S. 478 (1986), in the context of a request for an evidentiary hearing). To aid the Court in making credibility assessments of each witness, the Court reviewed the relevant case law regarding post-trial recantations. In general, "recanted testimony is properly viewed with suspicion." United States v. Pearson, 203 F.3d 1243, 1275 (10th Cir. 2000) (citation omitted). A witness's post-trial recantation is suspect because:

> [t]he trial is the main event in the criminal process. The witnesses are there, they are sworn, they are subject to cross-examination, and the jury determines whether to believe them. The stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial.

United States v. Grey Bear, 116 F.3d 349, 350 (8th Cir. 1997).

Upon de novo review of the entire record in this case, the Court finds that J.C.'s testimony at the evidentiary hearing was not credible. Multiple inconsistencies demonstrate J.C.'s lack of credibility. Significant to the Court's determination is the videotape of J.C.'s interview at CAC on November 1, 2005.[1] See Respondent's Evid. Hr'g Ex. 4. The credibility of J.C.'s testimony at the evidentiary hearing is impugned when it is compared to her videotaped interview at CAC. During the CAC interview, J.C. demonstrated that she understood the difference between truth and lies and agreed that she would be truthful. After some initial awkwardness, she appeared comfortable answering the interviewer's questions, described being raped and sodomized by Petitioner, and

---

[1]The videotape of J.C.'s interview at CAC was not part of the record before the Court prior to the evidentiary hearing. However, during the evidentiary hearing, Stinnett identified the copy of the CAC interview and it was admitted into evidence. See Dkt. # 62 at 149-50.

discussed her troubled life openly.[2] She did not appear to be coerced nor did she appear to be trying to remember details of a false story.

At the evidentiary hearing, J.C. testified that, during the CAC interview, Stinnett was present in the same room with her and the interviewer, and that "[h]e just crossed his arms and kept looking at me to make sure I was doing a good job." See Dkt. # 62 at 102. However, at the end of the videotape, the interviewer walks out alone to "ask Wayne [Stinnett] if I forgot to ask you anything," and left J.C. waiting in the interview room. Clearly, Stinnett was not present in the room at that point of the interview.[3] Also, during the course of the CAC interview, J.C. either looked at the interviewer or looked down. She did not look towards the camera as if Stinnett were standing behind the camera, as she alleged during the evidentiary hearing.

In addition, near the end of the CAC interview, J.C. describes an event which had occurred the Wednesday before the interview. J.C. told the interviewer that she and her friend, Jasmine, were "kicked off" of Sequoyah Schools' property because Jasmine was smoking cigarettes on the campus. She told the forensic interviewer that she had been busted for having cigarettes before and "[i]f I get in trouble one more time, then I'm going straight to juvie." That comment implies that at the time of the CAC interview, J.C. had had previous encounters with authorities that caused her to fear being sent to juvenile detention. Yet during the evidentiary hearing in this matter, J.C. testified that

---

[2] J.C. told the interviewer that her rape by Petitioner was the second time she had been raped. The first time occurred in August 2004. After describing what had happened with Petitioner, J.C. told the interviewer that she had received mental health treatment for a "bad anger problem," also for self-harm, suicide, and depression. She showed the interviewer scars on her arms and knuckles resulting from cutting herself.

[3] The record also contains the affidavit of the interviewer, Martha Kross-Vinson, the Executive Director of the CAC, who states that Stinnett "observed the interview live (from another room)." See Dkt. # 6-8 at 17.

11

Stinnett and Abitbol threatened to send her to juvie unless she testified that she was raped by Petitioner and told the undersigned that her fear of juvenile hall was based only on information obtained from her friends. Id. at 111. In addition, the undersigned specifically asked J.C. "[y]ou'd had no problems yourself or weren't being investigated for anything back in 2005-2006 that would make you think that you could be sent to juvenile hall –?" Id. at 113. J.C. answered "[n]o." Id. Thus, J.C.'s testimony at the evidentiary hearing is directly contradicted by statements made during the CAC interview.

Further, at the evidentiary hearing, J.C. testified that, when she was 13 years old, she had a very close relationship with her mother and that she did not have a habit of keeping things from her mother. See Dkt. # 62 at 110-12. Despite that close relationship with her mother, J.C. testified that she did not tell her mother that she was not raped, nor did she tell her mother that Stinnett had threatened her. Id. at 111. J.C.'s testimony concerning her relationship with her mother is inconsistent with her statements made during her CAC interview. During the interview, J.C. told the interviewer that "I haven't been getting along with my parents too well," and that she had threatened to run away from home. See Respondent's Evid. Hr'g Ex. 4.

Also, during the evidentiary hearing, both Petitioner and J.C. testified that they did not know each other prior to meeting at Crawford's home on October 8, 2005. See Dkt. # 62 at 13, 48. That testimony corroborates information given by J.C. during her CAC interview when she told the interviewer that she had never met Petitioner prior to his visit to Crawford's home. Significantly, she told the interviewer that, after Petitioner raped her, her told her not to tell anybody because he had "been in trouble for doing this to minors before." Petitioner had in fact been "in trouble" before. See Dkt. # 9-9 at 8 (Pre-Sentence Investigation report prepared for Rogers County District Court,

12

Case No. CF-2006-26).[4]  Given the testimony that J.C. did not know Petitioner prior to the night of the rape, J.C. could not have known Petitioner's criminal history unless he actually told her that he had "been in trouble for doing this to minors before." Thus, the videotape of the CAC interview supports a finding that J.C.'s trial testimony was not perjured.

The Court also finds J.C.'s testimony that Stinnett and Abitbol threatened her in order to obtain her false testimony and showed her pornography before her CAC interview lacks credibility. At the evidentiary hearing, Abitbol testified that the case against Petitioner was unusual because there were four (4) victims. See Dkt. # 62 at 182. He also testified that he had already decided to charge Petitioner with the rapes of Bethel and B.O. before he received the reports on L.S. and J.C.. Id. at 201. Thus, even without the allegations of J.C. and L.S., Petitioner faced prosecution on seven (7) felony counts involving Bethel and B.O. It is extremely unlikely, especially under these facts, that the Assistant District Attorney and investigator would take the extraordinary steps of threatening J.C. and showing her pornography to secure an untrue allegation of rape against Petitioner.

In the Order and Judgment remanding this issue for an evidentiary hearing, the Tenth Circuit stated that "[b]ased on the [Starkey] interview transcript alone, it is ambiguous whether J.C. had consensual sex with Green, or whether J.C. and Green engaged in sexual activities at all." See Dkt. # 32 at 16-17. At the evidentiary hearing, both Petitioner and J.C. denied having any sexual contact during Petitioner's visit to the Crawford home. See Dkt. # 62 at 25-26, 52. Petitioner argues that their testimony cleared up the ambiguity noted by the Tenth Circuit. See Dkt. # 65 at 19-20.

---

[4] In Rogers County District Court, Case No. CF-2001-146, Petitioner was charged with Rape by Instrumentation (Count 1) and Lewd Molestation (Count 2). On June 25, 2001, he was acquitted at the conclusion of a non-jury trial.

However, upon thorough review of the record before the Court, the Court finds that the testimony of J.C. and Petitioner given at the evidentiary hearing lacks credibility. Petitioner testified that, in December 2012, he received a letter from J.C. apologizing for her trial testimony. See Dkt. # 62 at 26. The letter from J.C. is not part of the record in this case. However, Petitioner wrote a responsive letter to J.C. and that letter is part of the record. See Respondent's Evid. Hr'g Ex. 5. In his letter, Petitioner wrote "[t]he only thing I don't get is why you say we had sex. We didn't. That's what I remember." See id. At the evidentiary hearing, Petitioner explained that, in his letter, he "was referring to the State's characterization of the David Starkey transcript" and he "was just confused." See Dkt. # 62 at 34. But statements made by both J.C. and her mother at the Starkey interview strongly imply that J.C. did not deny having sex with Petitioner, but instead characterized the encounter as consensual as opposed to forcible. See, e.g., Petitioner's Evid. Hr'g Ex. 18A at 17-18, 25.

In addition, the Court finds it difficult to rely on the Starkey interview. Starkey stated more than once that his goal was to expose "corruption" in Rogers County and describes Claremore as "the dirtiest town." See Petitioner's Evid. Hr'g Ex. 18A at 4, 34, 58. The tone of the interview clouds the credibility of any statements given. Had J.C. and her mother been questioned by an unbiased interviewer, the ambiguity noted by the Tenth Circuit could have been resolved at the time of the interview. J.C. and her mother repeatedly describe J.C.'s sexual encounters in terms of degrees of rape. For example, J.C. describes her rape by Sam Allen, which occurred on April 2, 2006, or approximately six (6) months before Petitioner's trial, as a "very abusive rape." Id. at 10. Continuing to describe the Allen incident, J.C. further stated "[t]hat's what you call rape." Id. J.C. also stated that she was put in "lockdown" because her mother did not think J.C. had been raped and

thought J.C. "was doing this willingly." Id. at 14. J.C. uses the same language, "I did that willingly," later in the interview when describing her sexual encounter with Petitioner. Id. at 17-18. More than five (5) years later, at the evidentiary hearing held in this case, J.C. explained that when she said "I did that willingly," she meant that she "did the statement willingly," not that she willingly engaged in sex with Petitioner. See Dkt. # 62 at 90. Although J.C. denied having any sexual contact with Petitioner, see id. at 52, her explanation does not fit within the context of the rest of her statement to Starkey.

In addition, at the evidentiary hearing J.C.'s mother also denied that J.C. admitted to having consensual sex with Petitioner during the Starkey interview. Id. at 139. Yet, during the Starkey interview, while discussing the allegations of rape involving B.O., another minor victim, J.C. noted "[Petitioner] got, like, four years from her." See Petitioner's Evid. Hr'g Ex. 18A at 25. J.C.'s mother added, "that's because it was statutory rape, *which is what [Petitioner] should have gotten for you, statutory rape*, which is – doesn't carry the sentence that he's serving."[5] Id. (emphasis added). Those statements unambiguously imply that, at the time of the Starkey interview, J.C.'s mother believed that J.C. had admitted to having consensual sex with Petitioner. That record casts doubt on the credibility of the testimony given by both J.C. and her mother at the evidentiary hearing.

In contrast to the testimony of J.C., the Court finds that the testimony of Stinnett and Abitbol to be credible. As discussed above, J.C.'s allegations that Stinnett and Abitbol threatened her and

---

[5] Although J.C. testified at the evidentiary hearing that she had no sexual contact with Petitioner on the night of the incident at Crawford's house, J.C. did not correct her mother during the Starkey interview when her mother stated that Petitioner should have been convicted of statutory rape of J.C. During the Starkey interview, J.C. did not hesitate to disagree with her mother when their memories differed. See Petitioner's Evid. Hr'g Ex. 18A at 53-54.

15

had her watch pornographic videos lack credibility. In addition, J.C.'s testimony at the preliminary hearing and at trial, see Dkt. # 8 at 59-86; Dkt. # 8-3 at 245-281, was consistent with the information given during the CAC interview, see Respondent's Evid. Hr'g Ex. 4. Both Stinnett and Abitbol testified at the evidentiary hearing that they believed J.C.'s allegations against Petitioner to be truthful. See Dkt. # 62 at 176, 186, 201. Therefore, even if J.C. lied about being forcibly raped and sodomized by Petitioner, the prosecutors had no reason to know that she was lying. Petitioner has not satisfied the second prong of the showing required under Agurs, 427 U.S. at 103.

As a final matter, the Court notes that, during the evidentiary hearing, after recanting her allegations of rape and forcible sodomy, J.C. also expressed her opinion that nothing happened between her friend, L.S., and Petitioner. See Dkt. # 62 at 52. J.C. explained that she "was there the whole time," and that Petitioner made no sexual advances, no sexual touching, and no threats towards L.S. Id. Significantly, however, L.S. did not testify at the evidentiary hearing held in this matter. Nothing in the record, with the exception of the affidavit of Kevin Tatum provided by Petitioner, see Petitioner's Evid. Hr'g Ex. 24,[6] suggests that L.S. has recanted her testimony.

In summary, the competing testimony offered at the evidentiary hearing goes to the first two Agurs prongs – whether Petitioner's convictions based on J.C.'s trial testimony rest on false evidence and whether the prosecution knew or should have known of J.C.'s perjured testimony. Thus, this case boils down to one question: Who is more credible, the trial prosecutor and investigator or J.C.? For the reasons discussed above, the Court finds the prosecutor and the investigator to be more credible than J.C. Furthermore, the record before the Court, including two

---

[6]In his affidavit, Tatum states that L.S. told him, prior to December 17, 2007, that she had testified falsely against Petitioner. See Petitioner's Evid. Hr'g Ex. 24. However, the statements in the affidavit constitute hearsay and would be inadmissible.

videotaped interviews of J.C. – both her CAC interview and her interview by Stinnett after the Allen rape – as well as the transcripts from Petitioner's trial, the transcript from the Starkey interview, and J.C.'s testimony given at the evidentiary hearing held in this matter, reflects that J.C. was emotionally and mentally disturbed as a young teenager. Nonetheless, J.C.'s most consistent statements were those given during the CAC interview and Petitioner's trial proceedings. As stated above, even if her trial testimony was perjured, the prosecution had no reason to know of the perjury. Therefore, the Court finds that Petitioner has failed to establish a due process violation and has not demonstrated "that the prosecution's case include[d] perjured testimony and that the prosecution knew, or should have known, of the perjury.'" Agurs, 427 U.S. at 103. Petitioner's request for habeas corpus relief on the remanded claim is denied.

**ACCORDINGLY, IT IS HEREBY ORDERED that** Petitioner's request for habeas corpus relief on his claim that his convictions rested upon perjured testimony knowingly offered by the government is **denied**.

DATED this 6th day of May, 2014.

*[signature: Terence Kern]*

**TERENCE KERN**
**United States District Judge**